**TOWN OF SECAUCUS, and Anthony E. Just, Sr., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF TRANSPORTATION, Federal Transit Administration; Gordon J. Linton in his capacity as Administrator of the Federal Transit Administration; Hackensack Meadowlands Development Commission; New Jersey Transit Corporation; and Allied Junction Corporation, Defendants.**

Civ. No. 94–6288 (DRD).

United States District Court,
D. New Jersey.

April 17, 1995.

---

Cindy Nan Vogelman, Chasan, Leyner, Tarrant & Lamparello, Jersey City, NJ, for plaintiffs.

Robert M. Hanna, Asst. U.S. Atty., Newark, NJ, for defendants, U.S. Dept. of Transp. and Gordon J. Linton.

E. Philip Isaac, Deputy Atty. Gen., Newark, NJ, for defendants, Hackensack Meadowlands Development Com'n and New Jersey Transit Corp.

Edward Paul Alper, Joseph & Feldman, Fort Lee, NJ, for defendant, Allied Junction Corp.

## OPINION

DEBEVOISE, Senior District Judge.

Plaintiffs, the Town of Secaucus and its Mayor, seek to enjoin preliminarily and permanently the expenditure of federal funds for the construction of a $448 million transportation hub in the Town of Secaucus. Defendants, who are two federal and two state parties and a private property, oppose the preliminary injunction, and have filed cross-motions to dismiss the complaint. Plaintiffs have moved for leave to file an amended complaint. For reasons which follow, the defendants' motions will be granted, the

plaintiffs' motions will be denied, and the complaint will be dismissed in its entirety.

## I.

*Pleadings and Procedural Background*

### A. The Complaint:

Plaintiffs are the Town of Secaucus and Anthony E. Just, Sr., a resident, taxpayer and the Mayor of Secaucus.

Defendants are (i) United States Department of Transportation, Federal Transit Administration ("FTA"), the agency charged with the administration of federal funds under the Intermodal Surface Transportation Efficiency Act ("ISTEA" or the "Act"), 49 U.S.C. § 5301, *et seq.*); (ii) Gordon J. Linton, administrator of the FTA; (iii) Hackensack Meadowlands Development Commission ("HMDC"); (iv) New Jersey Transit Corporation ("NJ Transit"); and (v) Allied Junction Corporation, a New Jersey corporation ("Allied").

The complaint alleges certain facts, which do not appear to be in dispute, namely:

In the early 1980's Allied purchased land in Secaucus which is now the site where the Northeast Corridor, Main and Bergen County railroad lines converge. In March 1990, Allied submitted a revised General Plan application to the HMDC seeking approval of a mixed use 4.7 million square foot development, including a 272,000 square foot train station known as the Secaucus Transfer Station to be constructed and operated by NJ Transit, as well as extensive office and retail space, hotel rooms and requisite parking structure.

HMDC is a political subdivision of New Jersey organized under N.J.S.A. 13:17–5. Within its designated statutory boundaries, N.J.S.A. 13:17–5 has zoning authority over 14 municipalities. Approximately 88% of the land area of Secaucus is subject to HMDC's zoning authority. In September 1992 HMDC approved Allied's revised plan and in December 1993, HMDC overrode the Hackensack Meadowlands Municipal Committee veto of its approval of the Allied revised General Plan.

In April 1993 Allied and NJ Transit entered into an agreement (the "Agreement") enabling Allied to implement its development plan. NJ Transit undertook to use $15,700,-000 of the federal funds it was to receive for the Secaucus Transfer Station for the construction of foundations structurally sufficient to support the 4.7 million square foot commercial development. Were the foundation built sufficient only to support the Transfer Station, it would have been unnecessary to expend this $15,700,000.

Under the Agreement with NJ Transit, Allied is required to reimburse NJ Transit for the $15,700,000 in federal funds, and if Allied elects to construct the commercial development, it is required to reimburse NJ Transit for all construction costs relating to the Transfer Station and improvements up to a maximum of $59,335,000.

Allied has no assets other than the land on which the Transfer Station is to be built. The only security for its obligation to NJ Transit is a mortgage on that land. The land was purchased in 1982 for $130,000. In a January 1995 interview, Allied's president stated that the land was worth no more than $5 million.

Hearings on Allied's implementation of its project proceeded before the HMDC in 1994. There was strong local opposition to the plan, but HMDC's staff issued a report dated October 28, 1994, in support of the Transfer Station. On November 9, 1994, HMDC unanimously approved construction of the Transfer Station.

In December 1994 FTA forwarded to NJ Transit a full funding agreement for the Secaucus Transfer Station. The funding included $15.75 million for construction of foundations of sufficient strength to support Allied's 4.7 million square foot commercial development.

Plaintiff's principal ground for attack on the Allied project is a simple one: the use of ISTEA funds to pay for the foundations required to support Allied's proposed structure violates a statutory prohibition.

It is undisputed that if the proposed Allied structure were not built over the Transfer Station, the expenditure of the $15.7 million

would be unnecessary. Plaintiffs assert that this expenditure for the benefit of Allied flies in the face of 49 U.S.C. § 5309(f)(2)(B) which provides:

(f) Required payments and eligible costs of projects that enhance urban economic development or incorporate private investment.

(1) Each grant or loan under subsection (a)(5) of this section shall require that a person making an agreement to occupy space in a facility pay a reasonable share of the costs of the facility through rental payments and other means.

(2) Eligible costs for a project under subsection (a)(5) of this section—

(A) include property acquisition, demolition of existing structures, site preparation, utilities, building foundations, walkways, open space, and a capital project for, and improving, equipment or a facility for an intermodal transfer facility or transportation mall; but

(B) do not include construction of a commercial revenue-producing facility or a part of a public facility not related to mass transportation.

It is plaintiffs' contention that the Allied project is "not related to mass transportation" and, thus, the $15.7 million expenditure of federal funds is unlawful.

Count One of the complaint seeks a judgment finding that the Allied–NJ Transit Agreement violates federal law and is unenforceable.

Count Two seeks a judgment finding that the Agreement violates federal law and public policy because it provides for the use of federal funds without adequate security.

Count Three seeks a writ of mandamus against the FTA and Linton requiring them to refuse to permit ISTEA funds to be used to subsidize Allied's development, including use of $15.7 million for construction of the strengthened foundation.

Count Four seeks a judgment enjoining the FTA and Linton from distributing and Allied and NJ Transit from receiving and using $15.7 million ISTEA funds for construction of foundations structurally sufficient to support Allied's private commercial development.

Count Five challenges the actions of HMDC approving the Secaucus Transfer Station and seeks a judgment directing HMDC to rescind its resolutions permitting use of the $15.7 million ISTEA funds.

Count Six challenges HMDC's actions as arbitrary and capricious in light of ecological and typical zoning, land use and municipal planning considerations. Count Six seeks a judgment enjoining the construction of the Secaucus Transfer Station as violative of federal law and public policy, as a wasteful and unnecessary use of public funds, and as detrimental to the public interest.

### B. *Subsequent Proceedings:*

Plaintiffs sought a temporary restraining order, which I denied, because it did not appear that expenditure of funds pursuant to the Agreement was imminent. I scheduled a hearing on plaintiffs' application for a preliminary injunction.

The federal defendants (FTA and Linton), the state defendants (HMDC and NJ Transit) and Allied filed affidavits and exhibits in opposition to the application for a preliminary injunction. In addition, the defendants moved to dismiss the complaint.

### C. *Defendants' Factual Contentions:*

The affidavits provide factual data which, while not contradicting the facts set forth in the complaint, spell out the context in which the Allied–NJ Transit Agreement arose.

The Secaucus Transfer Station is a facility that NJ Transit has planned which will link service on various passenger rail lines in New Jersey that were originally built and operated by private and sometimes competing railroad companies but are now run by NJ Transit. The need to transform these separate rail lines into an integrated statewide rail system, to enable improved distribution service for NJ Transit railroad passengers, has been recognized since before World War II. Studies exploring methods of achieving such an integrated state-wide system were done as early as the mid–1960's,

when the federal government began funding mass transit.

Secaucus is the exclusive site for the connecting facility because it is the only location where three of New Jersey's primary passenger rail lines converge: the Northeast Corridor, the Bergen County Line and the Main Line.

Financial and institutional barriers prevented immediate progress toward the design and implementation of a connecting facility in Secaucus and other new rail connections. However, momentum was regained in the late 1970's when NJ Transit was established by the State Legislature and given jurisdiction over all the passenger rail service and lines in New Jersey. By the mid–1980's, the Secaucus Transfer Station and two other connections (the Kearny Connection and Montclair Connection linking the old Morris and Essex and Boonton rail lines with the Northeast Corridor) were being actively planned and developed by NJ Transit as a unified, major initiative, to connect the northern New Jersey commuter rail network.

The above-referenced site for the Secaucus Transfer Station, i.e., the site where the Northeast Corridor, Main and Bergen County Lines converge, was purchased in 1982 by a group of trustees connected with Allied for purposes of building a commercial development thereon. Recognizing that having public transportation available was a crucial precondition to such a development, Allied began working with NJ Transit on the planning of a rail transfer station on the Allied Property that could allow the commercial development. Negotiations eventually led to the Agreement between NJ Transit and Allied.

While NJ Transit has always intended to integrate New Jersey's passenger rail service by building a connecting railroad facility in Secaucus, the public-private partnership established in the agreement entered into between NJ Transit and Allied Junction Corporation dated April 26, 1993, has accelerated the delivery of this benefit to New Jersey residents.

More specifically, NJ Transit is able to move forward quickly with the project because Allied agreed to convey to NJ Transit for no monetary consideration, an easement in perpetuity to enter, use and construct on the property which is needed to build the transfer facility.

As part of the overall transaction, and in return for the easement in perpetuity, NJ Transit agreed to increase the size of the foundation caissons on two sides of the rail station to allow for possible overbuild by Allied.

The costs to build the larger caissons were estimated by the consulting firm of Stone and Webster to amount to $15.7 million. Under the terms of the agreement between NJ Transit and Allied, this payment shall be made whether or not Allied ever exercises its option to build the commercial development, and this obligation is secured by an April 26, 1993 mortgage on Allied's Property.

If Allied exercises its option to construct its commercial development, NJ Transit shall receive from Allied a capital cost payment of $59,335,000 for construction of the rail station, most of which offsets costs NJ Transit will incur whether or not commercial development is added to the Secaucus Transfer Station, plus actual costs in relocating Main Line tracks (estimated at $3 million), and a perpetual annual income stream constituting a percentage of the rents from the commercial development. Allied is required to pay NJ Transit half of every loan dollar it borrows to finance the project, within twenty days after it receives such funds. In addition, Allied must pay the entire sum before any person may take occupancy in any building in the commercial development. If Allied elects not to build within ten years after passenger rail service begins, NJ Transit may foreclose on Allied's Property and seek other parties to develop commercial space above the station, with net proceeds going to NJ Transit.

The Secaucus Transfer Station is meant to more efficiently move people by rail and transfer people out of cars and into public mass transit. The predominant use of public mass transit is travel to employment. It is estimated that if the Allied Development is implemented, NJ Transit Rail will carry a minimum of 48 percent of an estimated 16,-000 employees to work there, and a signifi-

cant amount of people to shop in the retail businesses which may open there. In addition, about 2,000 new bus riders are expected to be generated.

The cost of construction of the Secaucus Transfer Station is expected to be $448 million, with the largest portion of the cost for the reconfiguration of the Northeast Corridor from two tracks to four tracks, with provisions for a future fifth track. The work will be multi-disciplined, including environmental mitigation, earthwork, bridge, embankment and trackbed construction, the laying of track and the building of electrical traction structures, and signal and communications systems. Additional track realignment will be required on the Main, Bergen and Boonton Lines, and track modification will also be necessary in Conrail's nearby Croxton Yard to accommodate new bridges for the new Northeast Corridor tracks. A substantial amount of time and financial resources has already been devoted to the project's design.

The Secaucus Transfer Station building, estimated to contain 272,000 square feet of space, will be a three-level passenger facility located where the Northeast Corridor intersects the Main Line. The lowest level will serve Main Line passenger transferees, the intermediate level will serve Northeast Corridor passengers and the upper level will be a concourse housing station management, ticketing operations, customer service and some retail space to provide amenities for commuters. There is a provision for an island platform on the Bergen Line, connected to the station by an elevated pedestrian walkway, to be built in the event the rail station opens before the commercial overbuild and Main–Bergen connection are implemented.

More than $432 million of the $448 million capital federal funds are necessary for the costs of the rail station and line reconfiguration only. As mentioned above, the estimated $15.7 million which will be used to make some of the station's foundation caissons bigger, is being spent in the course of the overall transaction between NJ Transit and Allied, in lieu of land acquisition costs, because NJ Transit negotiated an easement in perpetuity on the Allied Property, and a promise by Allied that it will compensate NJ Transit for the extra construction costs. This promise is backed up by a mortgage on the 28.5 acres.

If Allied proceeds with its development, the construction will be as follows. Allied will build one hotel building with approximately 420,000 square feet of hotel room space, four office buildings with about 3 million square feet of office space, and about 112,000 square feet of retail space on the lower floors of the five buildings.

The Secaucus Transfer Station will be intermodal with local buses serving the rail hub and commercial enterprises, bus service between the transfer station and the PATH system in Journal Square, and roadway improvements facilitating local access to the transfer station and routing travelers directly to the New Jersey Turnpike via a proposed new Turnpike interchange, which is proposed to tie into Routes 1 and 9. The Secaucus Transfer Station would also provide a link between Newark Penn Station and Hoboken, and between Newark Broad Street Station and the Meadowlands.

As defendants see it, the Secaucus Transfer Station is (1) the cornerstone of integrated mass rail transit in New Jersey, (2) a necessary component of the State Implementation Plan (SIP) to which NJ Transit must conform, pursuant to the federal Clean Air Act, and (3) a major mass transit project specifically endorsed by ISTEA. The various components of the Secaucus Transfer Station are in the advanced stages of design and engineering, or ready for construction, and the Federal Transit Administration has committed $448,000,000 to implement it.

### D. *Defendants' Legal Contentions:*

With respect to plaintiffs' application for injunctive relief, defendants contend that the application of the law to those facts demonstrates that plaintiffs cannot succeed on the merits of their claims. Further, defendants contend that the other requirements for injunctive relief are lacking.

In addition to filing extensive affidavits and exhibits in opposition to the application for a preliminary injunction, defendants

moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) on a number of grounds: (i) the federal transit laws do not expressly authorize a private right of action, and none should be implied; (ii) plaintiffs lack standing to pursue any claim under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (the "APA") or by way of mandamus under 28 U.S.C. § 1361 since they cannot show any "injury in fact" within the zone of interests protected or regulated by the federal transit laws; and (iii) on the merits, §§ 5309(a)(5) and 5309(f)(2)(A) specifically authorize the FTA to fund "building foundations" for "commercial and residential development" which are incorporated into mass transportation projects such as the Transfer Station.

## II.

### *Discussion*

#### A. *Jurisdiction:*

Jurisdiction exists under 28 U.S.C. § 1331 (federal question). Plaintiffs assert supplemental jurisdiction under 28 U.S.C. § 1367.

#### B. *The Statutory Basis for Declaratory and Injunctive Relief:*

■ An initial question raised by the defendants is whether ISTEA confers a private right of action upon the plaintiffs and thereby provides a basis for their claims for declaratory and injunctive relief. Plaintiffs contend that the statute grants both express and implied private rights of action.

■ As to an express private right of action, plaintiffs rely solely upon 49 U.S.C. § 5334(a)(2), which provides that "[i]n carrying out this chapter, the Secretary of Transportation may ... sue and be sued...." Although that language evinces a waiver of sovereign immunity, it does not constitute an express creation of a private right of action. *See e.g., Rousseau v. City of Philadelphia,* 589 F.Supp. 961, 968 (E.D.Pa.1984) ("This language simply confers a status or capacity upon the Secretary, and makes no expression that a private right of action is the necessary or appropriate means of enforcing the statute [Housing Act of 1949]."); *Smith v. Russellville Production Credit Ass'n,* 777 F.2d 1544, 1548 (11th Cir.1985) ("[The] argument [that]

a 'sue and be sued' provision in the Farm Credit Act is evidence that Congress intended to create a private right of action under the act, is completely without merit.").

Rather, the more appropriate inquiry is whether through an analysis of congressional intent, a private right of action can be implied as arising from the statute. *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 535–36, 104 S.Ct. 831, 838–39, 78 L.Ed.2d 645 (1984). The Supreme Court has stated that the factors to be considered in such an inquiry are: (1) whether the plaintiff is " 'one of the class for whose *especial* benefit the statute was enacted,' ... that is, does the statute create a federal right in favor of the plaintiff?"; (2) "is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?"; (3) "is it consistent with the underlying purposes of the legislation to imply such a remedy for the plaintiff?"; and (4) "is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (citations omitted); *see also Daily Income Fund,* 464 U.S. at 536, 104 S.Ct. at 838–39; *Bor. of Ridgefield v. N.Y. Susquehanna & Western R.R.,* 810 F.2d 57, 59 (3d Cir.1987).

■ Subsequent Supreme Court decisions have emphasized the overriding importance of congressional intent as embodied in the first two factors. *See California v. Sierra Club,* 451 U.S. 287, 297–98, 101 S.Ct. 1775, 1781–82, 68 L.Ed.2d 101 (1981); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 580, 99 S.Ct. 2479, 2491, 61 L.Ed.2d 82 (1979) (Brennan, J., concurring); *U.S. v. FMC Corp.,* 717 F.2d 775, 781 (3d Cir.1983). Those two factors are fundamentally interrelated because identification of a class of beneficiaries distinguishable from the general public "is meant to facilitate the more fundamental determination of whether the statute creates enforceable federal rights." *Rousseau,* 589 F.Supp. at 961 (citing *FMC Corp.,* 717 F.2d at 781).

Courts have found implied causes of action "where the language of the statute explicitly

conferred a right directly on a class of persons that included the plaintiff in the case." *Cannon,* 441 U.S. at 690 & n. 13, 99 S.Ct. at 1954 & n. 13. "Conversely, [the Supreme Court] has noted that there 'would be far less reason to infer a private remedy in favor of individual persons' where Congress, rather than drafting the legislation 'with an unmistakable focus on the benefitted class,' instead has framed the statute simply as a general prohibition or a command to a federal agency." *Universities Research Assn. v. Coutu,* 450 U.S. 754, 772, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981) (quoting *Cannon,* 441 U.S. at 690–92, 99 S.Ct. at 1955).

In light of those considerations, there is little evidence to support the plaintiffs' assertion that Congress intended to create an implied right of action under ISTEA. The statute fails to identify any special class of persons other than the general public as the beneficiary of the legislation. Furthermore, the provisions of the statute upon which the plaintiffs rely are devoid of the kind of "right- or duty-creating language" generally considered as giving rise to implied rights of action. *Cannon,* 441 U.S. at 690 & n. 13, 99 S.Ct. at 1954.

Plaintiffs admit that the section on which they base their claim "does not specifically identify the individuals who are to benefit from the funding prohibition...." (Pls.' Reply Br. at 26.) That section provides: "Eligible costs for a project under subsection (a)(5) of this section— ... (B) do not include construction of a commercial revenue-producing facility or a part of a public facility not related to mass transportation." 49 U.S.C. § 5309(f)(2). Rather, plaintiffs assert that the beneficiaries of that section can be gleaned from a preceding general ISTEA provision:

Preserving the environment.—It is the policy of the Government that special effort shall be made to preserve the natural beauty of the countryside, public park and recreation lands, wildlife and waterfowl refuges, and important historical and cultural assets when planning, designing, and carrying out an urban mass transportation capital project with assistance from the Government under section 5309 and 5310 of this title.

49 U.S.C. § 5301(e). Plaintiffs rely on that broad language to assert that the spending restriction of § 5309(f)(2)(B) was "specifically ... designed to benefit the communities and residents thereof who will experience the environmental effects of joint development projects." (Pls.' Reply Br. at 25.) That conclusion is without merit.

The language of § 5301(e), by which the government states its intention to make "special effort" to preserve the environment, falls far short of explicitly conferring a right on a special class of persons including the plaintiffs. Rather, it is exactly the kind of broad, goal-oriented language that typifies introductory statutory sections. Furthermore, that statutory goal cannot reasonably be read as providing the overriding basis for the limitation on eligible costs set forth in § 5309(f)(2)(B).

Plaintiffs' reliance on *Texas & Pacific Ry. v. Rigsby,* 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916), in support of their argument is misplaced. In that case, the Supreme Court found that a statutory provision mandating the use of specific safety equipment on railroad cars was enacted to benefit railroad passengers and employees, even though the intended beneficiaries were not explicitly named. The basis for the Court's determination was an obvious conclusion that "the safety of employees and travelers is [the statute's] principal object...." *Id.* at 39, 36 S.Ct. at 484. The logic of that analysis is far more straightforward than that urged by the plaintiffs in this case. Although environmental concern is embodied in ISTEA, it cannot be said to be the "principal object" of the statute or the provision upon which the plaintiffs base their claims.

Additionally, to the extent the statute states concern about the environmental and social impact of the transportation projects which are its principal object, those factors are addressed in other sections. For example, § 5324(b)(3)(A) provides:

The Secretary of Transportation may approve an application for financial assistance under section 5309 of this title only if the Secretary makes written findings, after

review of the application and any hearings held before a State or local governmental authority under section 5323(b) of this title, that—

(i) an adequate opportunity to present views was given to all parties with a significant economic, social, or environmental interest;

(ii) the preservation and enhancement of the environment and the interest of the community in which a project is located, were considered; and

(iii) no adverse environmental effect is likely to result from the project, or no feasible and prudent alternative to the effect exists and all reasonable steps have been taken to minimize the effect.

The statute thereby addresses environmental and social factors by requiring the Secretary to make written findings that such factors were considered and that parties in interest were given an adequate opportunity to present their views. Those requirements do not, however, evince congressional intent to provide a private right of action under the statute to those who disagree with the Secretary's conclusions.

Therefore, rather than manifesting an "unmistakable focus on [a] benefitted class," the language of § 5309(f)(2)(B) is just the type of "general prohibition or command to a federal agency" that provides little basis for finding a private right of action under ISTEA. *Universities Research*, 450 U.S. at 772, 101 S.Ct. at 1462; *see also Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 18, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981).

■ Because the first two factors of the *Cort* test are not satisfied, the inquiry ends. The remaining factors "are only of relevance[ ] if the first two factors give indication of congressional intent to create the remedy." *Sierra Club*, 451 U.S. at 298, 101 S.Ct. at 1781 (citing *Touche Ross*, 442 U.S. at 574–76, 99 S.Ct. at 2488–89). No express or implied private right of action exists under 49 U.S.C. § 5309(f)(2)(B) and, consequently, the plaintiffs' claims arising under ISTEA must be dismissed for failure to state a claim upon which relief may be granted pursuant to

Fed.R.Civ.P. 12(b)(6). *See Bor. of Ridgefield*, 810 F.2d at 61.

## C. *Administrative Procedure Act:*

■ Defendants contend that the same result would be obtained if plaintiffs' complaint were amended to include a claim under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*

■ Article III of the Constitution limits the jurisdiction of the federal courts to actual cases and controversies. The "doctrine of standing" serves to "set [ ] apart the 'Cases' and 'Controversies' of the justiciable sort referred to in Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). In order to have standing, a plaintiff must establish that he has suffered an "injury in fact." *Id.*

Defendants urge that plaintiff Just as a resident of Secaucus suffers no more than a "generalized grievance," which is not enough to confer standing. As to the Town of Secaucus in which the allegedly unlawful commercial project would be built, defendants assert,

Under this agreement, federal funds allegedly "*may* be used by Allied … in contravention of statute." Complaint ¶ 42 (emphasis added). Moreover, the alleged violation of law apparently depends on whether or not Allied "elects to construct the 4.7 million square foot commercial development," the real interest of plaintiffs' suit. Complaint ¶ 19. Plaintiffs' own pleading thus casts doubt on the imminence of the alleged injury.

(Federal Defs.' Opp'n Br. at 13.)

Thus, defendants argue that the Town of Secaucus has not suffered injury in fact because there is a substantial question whether the Allied project will ever be implemented. This contention is seriously weakened by the existence of factual material which defendants have submitted showing the importance of the integrated transit-commercial development. All the defendants appear to be proceeding with substantial expenditures of funds and efforts with the expectation that the Allied–NJ Transit Agreement will be implemented. If, in fact, the Agreement vio-

lates federal law, the effect of its implementation would be felt immediately and directly by the Town of Secaucus. This, it would seem, is sufficient injury in fact to confer standing upon the Town.

### D. *The Merits:*

■ Dispositive of both entitlement to injunctive relief and defendants' entitlement to dismissal of the complaint is the merits of plaintiffs' contention that 49 U.S.C. § 5309(f)(2)(B) prohibits use of federal funds to build the foundations of the Secaucus Transfer Station necessary to support Allied's commercial use.

■ If plaintiffs cannot establish this statutory prohibition, they cannot establish the first requirement for preliminary injunctive relief, a likelihood of success on the merits. If ISTEA authorizes such expenditures of federal funds, all of plaintiffs' federal claims must fail and the complaint should be dismissed.

An analysis of the statute and its legislative history supports the defendants' interpretation of the provisions in question.

Plaintiffs rely upon the spending prohibition embodied in 49 U.S.C. § 5309(f)(2), which provides that "[e]ligible costs for a project under subsection (a)(5) of this section—(B) do not include construction of a commercial revenue-producing facility or part of a public facility not related to mass transportation." Subsection (a)(5) authorizes projects incorporating private investments that "enhance the effectiveness of a mass transportation facility and are related physically and functionally to that mass transportation project...." 49 U.S.C. § 5309(a)(5). Plaintiffs assert that when read together, those provisions clearly prohibit funding reinforcement of the transfer station foundation because such reinforcement exists purely for the benefit of a potential commercial development above the station and is, therefore, "not related to mass transportation." That assertion requires that the phrase "related to" be read so narrowly as to prohibit foundation reinforcement when the public and private components of a project share a common foundation. Such an assumption is

negated by the wording of the statutory prohibition and by reading the prohibition in conjunction with other relevant provisions. Further, the true scope of the prohibition can be discerned through an examination of the statute in the context of its legislative history.

Section 5309(a)(5)—the provision that § 5309(f)(2) supplements—specifically authorizes funding for joint transportation/commercial/residential development projects. By its very terms, § 5309(a)(5), along with § 5309(f)(2)(A), envisions that federal transit dollars will be used to fund such elements as property acquisition, building foundations and utilities to enable the contemplated joint development to get off the ground. Transportation projects that "*incorporate* private investment, including commercial and residential development" are expressly eligible for funding where they "enhance the effectiveness of a mass transportation project" and are related "physically or functionally" to a mass transportation project.

Section 5309(a)(5) authorizes federal funding for defined projects. The express purpose of subsection (f)(2) is to describe particular items of cost that are, or are not, eligible for federal funding when incurred in carrying out the joint development projects authorized by subsection (a)(5), that is, "projects that enhance urban economic development or incorporate private investment."

When arguing from the statutory history of § 5309(f)(2), plaintiffs rely on the same kinds of faulty analysis that marked their facial reading of the statute. Specifically, plaintiffs refer to a Senate Report accompanying a bill which ultimately became part of the Urban Mass Transportation Act ("UMTA"), a precursor to ISTEA. In reference to a proposed UMTA provision similar to the spending prohibition of ISTEA's § 5309(f)(2), the Report states:

> It is not intended by this section that the Secretary would approve grants or loans for financing structures built on top of or in connection with the transportation facility that are not necessary to the proper functioning of the transportation facility, such as public or private office buildings that may or may not produce revenues.

S.Rep. No. 95–857, 95th Cong., 2d Sess. 9 (1978).

Defendants point out, however, that plaintiffs initially failed to refer to a preceding sentence of the same report which states, "Examples of activities which would be financed under this section include: foundation work and utility capacity that would accommodate both a transportation facility and a nontransportation facility. . . ." *Id.*

The plaintiffs urge that the Report is to be construed as stating that "federal funds could be used to pay for foundation work but only to the extent that such work was *'necessary* to the proper functioning of the transportation facility.' " (emphasis added) (Pls.' Br. in Further Support at 17.) However, to the extent that the Report makes a distinction between "necessary" and "unnecessary," it is with regard to "structures" such as "office buildings" which may be constructed on top of or adjacent to the transportation facility. Plaintiffs' reading expands the term "structures" to include the previous reference to shared foundations and thereby creates a new distinction between "necessary" and "unnecessary" shared foundation work. No such distinction is embodied in the Report or justified by other aspects of the legislative history of the provisions in question.

Rather, the legislative history supports the defendants' reading of ISTEA to allow for financing of shared foundation work despite the fact that the nontransportation facility itself would not qualify for financing. A detailed account of the legislative history of the pertinent provisions is set forth in the federal defendants' brief. In view of the fact that the language of the statute is unambiguous, it is unnecessary to resort to a detailed account of that history in this opinion.

■ Defendants' position is further supported by the well-settled principle "that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer. . . ." *Chevron, U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

I have concluded that the plaintiffs have misconstrued ISTEA. Section 5309(f)(2)(B)

does not prohibit the use of federal funds to pay for a foundation sufficiently strong to support the commercial structure contemplated by the Allied–NJ Transit Agreement. Rather, the joint transit-private enterprise kind of arrangement provided for in that Agreement is specifically authorized by the statute. This conclusion on the merits of the case is determinative of the pending motions.

## III.

### *Disposition of the Motions*

A. *Motion to Amend the Complaint:*

Plaintiffs have moved to amend their complaint to state a claim under the APA. That Act authorizes a district court to:

hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . .

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. . . .

5 U.S.C. § 706.

■ It is evident that the federal defendants' actions are not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law and are not in excess of statutory jurisdiction, authority, or limitations or short of statutory right. To the contrary, the actions of the federal defendants further the objects of ISTEA and are specifically authorized by statute. Despite the liberality with which courts treat motions to amend pleadings brought pursuant to Fed. R.Civ.P. 15(a), denial of a Rule 15(a) motion is a proper exercise of discretion when the amended pleading fails to state a viable cause of action. *S.S. Silberblatt, Inc. v. East Harlem Pilot Block,* 608 F.2d 28, 42 (2d Cir. 1979).

Since plaintiffs are not entitled to relief under the APA, their proposed amendment would be futile. Consequently, plaintiffs' motion to amend their complaint will be denied.

**B.** *Motion for Preliminary Injunction:*

The first requisite for preliminary injunctive relief is a likelihood of success on the merits. Since plaintiffs have no likelihood of success on the merits, their application for a preliminary injunction will be denied.

**C.** *Defendants' Motion to Dismiss:*

 Pursuant to Rule 12(b)(6), a plaintiff's complaint must be dismissed for failure to state a claim if a defendant demonstrates "beyond a doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628, 634 (3d Cir.1989); *Johnsrud v. Carter,* 620 F.2d 29, 33 (3d Cir.1980). All allegations set forth in the complaint must be accepted as true, *see Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081–82, 31 L.Ed.2d 263 (1972), and all reasonable inferences must be drawn in the plaintiff's favor. *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991). On a 12(b)(6) motion, the district court is limited to the facts alleged in the complaint, not those raised for the first time by counsel in its legal memorandum. *Hauptmann v. Wilentz,* 570 F.Supp. 351, 364 (D.N.J.1983), *aff'd without opinion,* 770 F.2d 1070 (3d Cir.1985), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986); *Seevers v. Arkenberg,* 726 F.Supp. 1159, 1165 (S.D.Ind.1989) ("This court is not at liberty, however, to consider allegations which do not appear in the complaint, but which are averred only in legal briefs.").

 Moreover, a plaintiff generally should be allowed to amend its complaint to cure any pleading deficiencies. "Even after a responsive pleading has been filed ... great liberality in allowing amendment of an initial pleading is often appropriate, especially when amendment will further the ends of justice, effectuate presentation of a suit's merits and not prejudice the opposing party." *Kiser v. General Electric Corp.,* 831 F.2d 423, 427 (3d Cir.1987), *cert. denied sub nom. Parker–Hannifin Corp. v. Kiser,* 485 U.S. 906, 108 S.Ct. 1078, 99 L.Ed.2d 238 (1988); *see also Howze v. Jones & Laughlin Steel Corp.,*

750 F.2d 1208, 1212 (3d Cir.1984). This is so because "[c]ourts must be cautious in assessing motions to dismiss, particularly where granting such a motion would terminate the litigation before the parties have had their day in court." *Kiser,* 831 F.2d at 428.

Despite the strict standards applicable to motions to dismiss a complaint, the complaint in the present case on its face fails to state a cause of action, and plaintiffs have not proposed an amendment which could cure this fatal defect.

As noted above, plaintiffs rely entirely upon their erroneous interpretation of 49 U.S.C. § 5309(f)(2)(B). Each Count of the complaint is premised upon this interpretation. Since that statutory provision does not prohibit the federal expenditures challenged in this case, and since that provision in conjunction with other provisions specifically authorize those expenditures, the complaint fails to state a cause of action as a matter of law and must be dismissed.

If Counts Five and Six were construed to assert state law claims, they should be dismissed because all federal claims have been dismissed. 28 U.S.C. § 1367(c)(3).

**IV.**

*Conclusion*

An order will be entered (i) denying plaintiffs' motion to amend the complaint, (ii) denying plaintiffs' motion for a preliminary injunction and (iii) granting defendants' motions to dismiss the complaint.