**TOWNSHIP OF BELLEVILLE,**
Plaintiff,

v.

**FEDERAL TRANSIT ADMINISTRA-TION, Gordon Linton (Administrator), Thomas J. Ryan (Regional Administrator), Shirley A. Dellibero (Executive Director, New Jersey Transit Corporation), Defendants.**

Civil Action No. 98–2836.

United States District Court,
D. New Jersey.

Dec. 9, 1998.

William C. Sullivan, Jr., Hardin, Kundla, McKeon, Poletto & Polifroni, Springfield, NJ, for Plaintiff.

Susan C. Cassell, Assistant U.S. Attorney, Office of the U.S. Attorney, Newark, NJ, for Defendants Federal Transit Administration, Linton and Ryan.

Patricia E. Willard, Deputy Attorney General, Office of the Attorney General, Newark, NJ, for Defendant DeLibero.

## OPINION

WOLIN, District Judge.

### INTRODUCTION [1]

Plaintiff, the Township of Belleville, brings this suit to challenge the issuance of a finding of no significant impact (FONSI) by defendant, the Federal Transit Administration (FTA). The FTA issued the FONSI to New Jersey Transit (NJT), thereby authorizing the use of federal transportation funds for the construction and design of a project known as the Newark City Subway Extension (subway extension) Vehicle Base Facility (base facility) (jointly, the project). Plaintiff premises its cause of action on the theory that certain federal statutory provisions have not been met by defendants, making the grant of the FONSI illegal. In light of these

---

1. A glossary of terms is appended to this Opinion for the reader's convenience.

alleged violations, plaintiff seeks an injunction halting design and construction of the project until the defendants remedy the alleged procedural deficiencies through the preparation of an Environmental Impact Statement (EIS) under the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 et seq., and a Major Investment Study (MIS) under the Intermodal Surface Transportation Efficiency Act (ISTEA), Pub.L. No. 102–240, 105 Stat.1914 (codified as amended in scattered sections of U.S.C.). Plaintiff has named as the FTA's co-defendants: Gordon Linton, Administrator of the FTA; Thomas J. Ryan, Regional Administrator of the FTA; and Shirley A. DeLibero, Executive Director of NJT.[2] This Opinion addresses a number of motions and cross motions made by the parties, including said motion for preliminary and permanent injunctive relief by plaintiff, summary judgment motions by all parties, and motions to dismiss by defendants DeLibero and the FTA.

## BACKGROUND [3]

Some familiarity with the background of this suit is essential. The Newark City Subway (the subway or NCS) is a light rail system maintained and operated by NJT that serves eleven stations between Franklin Avenue in Belleville and Pennsylvania Station in Newark on a 4.3 mile double track line. The subway operates daily from 4:30 a.m. to 12:30 a.m., provides peak hour service on two minute headways, connects to greater than fifty bus routes along the line, and carries over 16,000 passengers each weekday. It operates independently, without a physical connection to any other rail line.

The subway opened for service in 1935. Since 1954, all revenue service on the subway has been provided by thirty President's Conference Committee cars (PCCs), manufactured between 1946 and 1949. Over the years, the fleet has dwindled, and currently only twenty-four active PCCs remain. A minimum of sixteen cars are required in order to maintain the current level of peak period service on the subway.

The New Jersey Legislature created NJT as a public corporation in 1979, and on October 14, 1980, NJT acquired the former owner of the subway. NJT has operated and maintained the subway ever since.

In 1981, NJT commissioned an $18 million program to rehabilitate and refurbish the subway infrastructure and rolling stock, which program was completed in 1988. Modernization of the PCC fleet was designed to extend the fleet's life approximately ten years.

Currently, the PCCs are stored beneath Pennsylvania Station, where the subway maintenance facility is also located. The maintenance facility has one stub-end inspection/repair track. Space limitations in the maintenance facility allow only routine maintenance and minor repairs. More extensive work requires removal and trucking of the PCCs to off-site shops. The structural deterioration of the PCCs has led to considerable difficulty in their upkeep. Among the many

2. Plaintiff contends that it included DeLibero pursuant to Federal Rule of Civil Procedure 19, which reads in pertinent part as follows:

> A person who is subject to service of process and whose joinder will not deprive the Court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties
> . . . .

While it is curious that plaintiff has joined only DeLibero directly, and not New Jersey Transit, the Court concludes, without extended analysis, that DeLibero should remain party to the suit as the relief plaintiff seeks is an injunction prohibiting any activity on the project pending compliance by the FTA with NEPA and ISTEA. The plaintiff is correct that meaningful relief would require the scope of the desired injunction to include New Jersey Transit, of which DeLibero is

the Executive Director. See N.J.S.A. 27:25–5 (additional powers and duties of New Jersey transit corporation); N.J.S.A. 27:25–15 (officers, employees and professional consultants; powers and duties of corporation). As there can be no doubt that DeLibero and New Jersey Transit seek to proceed with the project, DeLibero's participation is essential to this Court's fair determination whether or not to grant the requested injunctive relief.

3. The material facts in this case are largely undisputed; it is the conclusions to be drawn from the facts that require examination. In this section, the Court draws liberally from the relevant statements of material facts, submitted by the parties in accordance with Local Federal Rule of Civil Procedure 56.1.

problems with the PCCs, major car components are no longer manufactured, the cars have doors on only one side, and the design of the cars does not lend itself to compliance with the accessibility requirements mandated by the Americans with Disabilities Act (ADA).

Considering the advanced age of the cars, modification of the PCCS to make them ADA accessible has been determined by NJT to be both structurally unfeasible and economically unwise. Accordingly, NJT intends to replace the PCCs with sixteen new light rail vehicles (LRVs), which comply with ADA requirements and are compatible for use on two other proposed light rail systems, the Hudson–Bergen Light Rail Transit System (HBLRTS) and the Newark–Elizabeth Rail Link (NERL).

The acquisition of the LRVs will pose new and different maintenance demands, unable to be met within the limited space of the Pennsylvania Station maintenance facility. A modernization study examined the possibility of expanding and retrofitting the existing facility, but concluded that this was neither feasible nor cost-effective. The study recommended that NJT construct a new base facility to replace the existing one at Pennsylvania Station.

The project was first advanced as a component of the NERL. In June, 1993, a NERL Options Study recommended construction of a single vehicle base facility in order to store, service, and maintain both the subway and NERL LRVs. In November, 1994, NJT notified the FTA that a new base facility would be required for the subway, regardless of whether the NERL system was ever constructed. The base facility was thereby advanced as an independent project, and an environmental assessment (EA) and technical report for the base facility, and extension of the Subway to reach it, were prepared in July, 1996.

The EA and Technical Report, upon which the issuance of the FONSI was based, detail the project. This Opinion will not duplicate what is already extensively reported upon in those documents. However, the general overview of the planned project is useful, and will be excerpted from the EA here:

## 1.1 PROPOSED ACTION

The Proposed Action is the construction of a vehicle base facility (VBF) for replacement light rail vehicles (LRVs) for the Newark City Subway (NCS), an extension of the NCS tracks to connect with the VBF . . ., along with three station options. The Proposed Action would be located in the municipalities of Belleville, Bloomfield, and Newark. The proposed improvements would be located primarily on abandoned industrial land, in existing transportation corridors and on open vacant land. Specific elements would include the following:

- Construction of a 0.3 mile (0.48 km) two-track light rail connection from the NCS Franklin Avenue Station to CONRAIL's Bloomfield Industrial Track (previously the Orange Branch).

- Rehabilitation of 0.60 mi (0.96 km) of CONRAIL's exiting freight only, single-track Bloomfield Industrial Track to a multiple track, 750 volt D.C. overhead electrified and signalized joint-use-freight and light rail transit line from Franklin Avenue in Newark, NJ to the vicinity of Bloomfield Avenue in Bloomfield, NJ.

- Construction of a new [Light Rail Transit (LRT)] grade crossing of Franklin Avenue in Newark.

- Reconstruction of existing at-grade freight railroad crossings (at Franklin Street in Belleville, Belmont Avenue in Belleville, and Grove Street in Bloomfield, NJ).

- Construction of an LRV maintenance shop and operations center building, storage yard, traction power substation, maintenance-of-way facility, police substation, and employee parking on an approximately 13 to 15 acre (5.3–6.1 ha) tract of vacant industrial property in Belleville and Bloomfield.

- Combining of the existing Franklin Avenue and Heller Parkway NCS stations into a single new station.

- Optional Intermodal station at Grove Street with park-and-ride facilities and bus transfer facilities in Bloomfield.

• Optional walk-on station at Belmont Avenue and Franklin Street in Belleville.

• Acquisition of property required for the proposed action.

The VBF shop and yard may be constructed initially to accommodate only the required NCS replacement fleet, which is currently estimated to be 16 LRVs. The VBF site (and design concept developed for the VBF) would allow expansion to accommodate a prospective combined NCS/NERL fleet of up to 39 vehicles. No future additional land acquisition is anticipated to accommodate the fleet expansion. (EA, 1–1 to 1–3).

The EA states that construction of the base facility would require a level site of approximately thirteen to fifteen acres in order to provide adequate space for the facility, storage yard, and test track. (EA, 2–1). The document notes that such sites "are scarce in the densely built-up area served by the NCS and none exists adjacent to the line." (EA, 2–1).

Two sites were considered for the base facility in the EA: 1) the Nesbitt Street Site, located in Newark between Orange Street and the NJT Morris and Essex Lines, and between Nesbitt Street and Dr. Martin Luther King, Jr., Boulevard; and 2) the Franklin Street Site, bounded by Franklin Street, Belmont Avenue, Bloomfield Avenue, Grove Street, and Watessing Avenue, and located on the Bloomfield/Belleville Township boundary. (EA, 2–1).

According to the EA, the Franklin Street site was selected as the preferred location for reasons pertaining to cost and construction. A main factor is the proximity of the existing CONRAIL Bloomfield Industrial Track (freight line), which passes about 400 feet from the northern terminus of the subway at Franklin Avenue. Accordingly, by obtaining rights to use the freight line, access can be established to the base facility site from the subway through the construction of a 0.3 mile two-track rail connection. Further, the availability of additional vacant land proximate to the proposed site and Bloomfield Avenue, a major feeder bus route, would allow construction of a new bus transfer and park-and-ride terminal station for the sub-

way at Grove Street and Bloomfield Avenue. (EA, 2–1).

The Nesbitt Street Site was determined to be unfeasible because it would require extensive retaining wall construction for both the site and access track, and two roadway bridges over the Morris and Essex Lines would have to be lengthened and replaced. Furthermore, a major electrical substation serving the Morris and Essex Lines would require relocation and reconstruction. (EA, 2–1).

The EA also considered an unsolicited proposal received by NJT that suggested constructing the base facility inside the existing loop at Franklin Avenue. This proposal lacked merit due to insufficient space at that site. Tunneling eastward to grade under Raymond Plaza East at Pennsylvania Station to increase underground space for maintenance in the existing shop was also proposed, but was deemed infeasible because the transition from subway to surface could not be physically accommodated in that area. (EA, 2–1).

In December, 1996, the FTA issued a finding of no significant impact (FONSI) with regard to the project. NJT asserts that construction on the base facility has already commenced and that investment to date surpasses $15 million. The project total is expected to cost greater than $60 million, a large portion of which will be financed through federal funding.

The Townships of Newark and Bloomfield favor the project, however, considerable opposition to the project has been brought by the Township of Belleville. This lawsuit arises as a result.

## DISCUSSION

### A. Standing

#### 1. Overview

 The initial issue confronting a federal court in every case is whether the court has jurisdiction to hear the claim. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, ——, 118 S.Ct. 1003, 1013, 140 L.Ed.2d 210 (1998); *Lujan v. Defenders of*

*Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A threshold jurisdictional issue entails the determination of whether plaintiff has standing to bring suit. *Steel Co.,* 523 U.S. at —, 118 S.Ct. at 1016. A "showing of standing 'is an essential and unchanging' predicate to any exercise of our jurisdiction." *Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658 (D.C.Cir.1996) (quoting *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130). For purposes of determining standing, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

■ The notion of standing includes both the Article III limitation on federal judicial review to "cases" and "controversies" as well as prudential considerations exercised as "part of judicial self-government." *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130. Generally speaking, the case or controversy requirement of Article III standing requires at the least three showings: first, that the plaintiff has suffered an "injury in fact" that is (a) "concrete" and "particularized", and (b) "actual" or "imminent", not hypothetical or conjectural; second, that the injury is causally connected to the challenged action; and third, that the injury is likely to be redressed by a favorable decision. *Steel Co.,* 523 U.S. at — – —, 118 S.Ct. at 1016–17; *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997); *Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. 2130.

■ In the Court's view, plaintiff in this case has little difficulty establishing a case or controversy. Plaintiff is the Township of Belleville. The alleged injury is the imminent construction of the project,[4] which will result in rail service within the town's borders, affecting its citizens personally, as well as their residences and businesses. Among the alleged injuries are noise, air, and visible pollution. Such personal aesthetic and conservational injuries to residents satisfy the injury in fact requirement. *United States v.*

*Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (*SCRAP*); *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Further, the township claims that the rail service will pose significant danger to its pedestrians, increase traffic, strike a blow to "civic pride", and result in a loss of property taxes. If such injuries are established, the Court finds that it would be impossible not to conclude that at least some of these injuries also result in discrete and particularized harm to the township.

"To prove causation, a plaintiff seeking the preparation of an EIS must demonstrate that the particularized injury that the plaintiff is suffering or is likely to suffer is fairly traceable to the agency action that implicated the need for an EIS." *Florida Audubon Soc'y,* 94 F.3d at 669. Here, plaintiff challenges the issuance of a FONSI by the FTA without an EIS or MIS. The FONSI is a prerequisite to the grant of federal funds. The project cost is expected to exceed $60 million, much of which will be received through federal transportation grants. There is little doubt that, without such funding, the project would not go forward. *Cf. Township of Springfield v. Lewis,* 702 F.2d 426, 450 (3d Cir.1983) (no standing where there was no evidence that NJDOT would not have continued project without federal monies). Plaintiff has, therefore, also met the causation element of Article III standing.

■ The Supreme Court has noted that, in cases alleging violations of procedural rights, as in a suit challenging the failure to prepare an EIS, a plaintiff need not meet the normal requirement of redressability. *Defenders of Wildlife,* 504 U.S. at 573 n. 7, 112 S.Ct. 2130. Thus, a plaintiff alleging a procedural violation is not forced to convince the Court that the preparation of an EIS or MIS would cause the agency to halt its plans, or even alter them. Justice Scalia did much to forward this thinking in his influential seventh footnote to the *Defenders of Wildlife* opinion:

> There is much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural

---

4. Construction has already begun on the base facility.

right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

504 U.S. at 572 n. 7, 112 S.Ct. 2130; *see also Florida Audubon Soc'y*, 94 F.3d at 669 ("in EIS suits, a court should not review redressability"); Brian J. Gatchel, *Informational and Procedural Standing after Lujan v. Defenders of Wildlife*, 11 J. LAND USE & ENVTL. L. 75, 106 (1995) (providing a thoughtful discussion of procedural standing and arguing that "courts should utilize footnote seven standing to completely remove redressability as a barrier for procedural plaintiffs").

■ This Court does not intend to broaden the point made by the Supreme Court. In the quoted footnote from *Defenders of Wildlife*, Justice Scalia used the example of "one living adjacent to the site for proposed construction", thus insuring that the alleged injury would directly impact upon the claimant personally, and making it considerably more difficult for a person seeking to raise a third party's interests to establish injury and causation.[5] Without seeking to expand on language that is more properly interpreted by our Court of Appeals, this Court simply follows the directive of the Supreme Court in concluding that here, where a township faces the prospect of extension of rail service and the construction of at least a portion of a maintenance facility within its own borders, plaintiff has Article III standing to challenge the FTA's decision to issue a FONSI without first requiring preparation of an EIS or MIS, notwithstanding plaintiff's inability to satisfy

normal redressability requirements, when the other elements of standing are established.

■ In addition to Article III requirements, courts must take into account those prudential limitations on standing " 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Bennett v. Spear*, 117 S.Ct. at 1161 (citation omitted). Among those limitations, the Supreme Court has interpreted the Administrative Procedure Act (APA), 5 U.S.C. § 702 et seq., "to impose a prudential standing requirement in addition to the requirement[ ] imposed by Article III of the Constitution." *National Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 118 S.Ct. 927, 933, 140 L.Ed.2d 1 (1998). Prudential standing under the APA requires that the " 'interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute ... in question.'" *Id.* (quoting *Association of Data Processing Service Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). Although no clear rule encapsulates the zone of interest test, the Supreme Court has clarified the initial inquiry to be taken:

The proper inquiry is simply "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected ... by the statute." Hence in applying the "zone of interests" test, we do not ask whether, in enacting the statutory provision at issue, Congress specifically intended to benefit the plaintiff. Instead, we first discern the interests "arguably ... to be protected" by the statutory provisions at issue; we then inquire whether the plaintiff's interests affected by the agency action in question are among them.

*Id.* 118 S.Ct. at 935 (citation omitted).

Accordingly, the Court will examine whether plaintiff's claims satisfy the prudential standing requirement of the APA.

---

**5.** Compare Justice Scalia's distinction between when "the plaintiff is himself an object of the action ... at issue" and when "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else." *Defenders of Wildlife*, 504 U.S. at

561–62, 112 S.Ct. 2130. In the former instance, "there is ordinarily little question that the action or inaction has caused him injury," whereas in the latter, "much more is needed." *Id.; see* Gatchel, *supra*, 11 J. Land Use & Envtl. L. at 76.

## 2. The APA

In the present case, plaintiff claims a right to judicial review of the FTA's decision to issue a FONSI pursuant to the APA, 5 U.S.C. § 702, which provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

The "relevant statute" refers to the statute "whose violation is the gravamen of the complaint." *See National Wildlife Federation*, 497 U.S. at 886, 110 S.Ct. 3177. In cases where the action challenged is not made reviewable by statute,[6] the APA authorizes review of "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704; *Florida Audubon Soc'y*, 94 F.3d at 665.

In the present case, the issuance of a FONSI constituted final agency action, *see Catron County Bd. of Comm'rs v. U.S. Fish & Wildlife*, 75 F.3d 1429, 1434 (10th Cir. 1996), and it appears that judicial review alone will suffice to remedy the plaintiff's alleged injury. Plaintiff's claims that the FTA violated provisions of NEPA and IS-TEA by issuing a FONSI without first requiring an EIS and MIS to be prepared make clear that the relevant statutes are NEPA and ISTEA.

## 3. NEPA Provisions

The National Environmental Policy Act was enacted to

declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

*See Township of Springfield*, 702 F.2d at 429 (quoting 42 U.S.C. § 4321(a) (1976)). "Toward this end, Congress imposed ... a substantive obligation upon all federal agencies to balance the environmental considerations and goals of the Congress along with the traditional factors of public interest particular to each agency's mandate." *Shiffler v. Schlesinger*, 548 F.2d 96, 100 (3d Cir.1977); *see* 42 U.S.C. § 4321(b). The statute requires preparation of a detailed statement, commonly known as an environmental impact statement, for any proposed federal actions "significantly affecting the quality of the human environment". 42 U.S.C. § 4332. The EIS is to consider

(i) the environmental impact of the proposed action,

(ii) any adverse environmental affects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which could be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C); *See Township of Springfield*, 702 F.2d at 429; *Catron County*, 75 F.3d at 1434.

The preparation of an EIS serves two main purposes: (1) "to inject environmental considerations into the federal agency's decisionmaking process," and (2) "to inform the public that the agency has considered environmental concerns in its decisionmaking process." *Catron County*, 75 F.3d at 1434; *see Public Interest Research Group v. Federal Hwy. Admin.*, 884 F.Supp. 876, 885 (D.N.J.1995). The detailed statement requirement has been described as the "heart and soul" of NEPA. *Morris County Trust for Historic Preservation v. Pierce*, 714 F.2d 271, 275 (3d Cir.1983). It also affords those outside the agency the opportunity to critically evaluate the agency's actions. *See Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346, 351 (8th Cir.1972).

---

**6.** Neither ISTEA or NEPA provides a private right of action. *See infra* note 7.

The Joint FTA/Federal Highway Administration (FHWA) regulations implement NEPA for highway and mass transit projects. *See* 23 C.F.R. Part 771. As not all proposals for federal funding will "significantly affect the environment," the regulations describe "three classes of action which prescribe the level of documentation required in the NEPA process." 23 C.F.R. § 771.115.

(a) *Class I* (*EIS* s). Actions that significantly affect the environment require an EIS (40 C.F.R. § 1508.27).

(b) *Class II* (*CE* s). Actions that do not individually or cumulative have a significant environmental affect are excluded from the requirement to prepare an EA or EIS.

(c) *Class III* (*EA* s). Actions in which the significance of the environmental impact is not clearly established. All actions that are not Class I or Class II are Class III. All actions in this class require the preparation of an EA to determine the appropriate environmental document required.

23 C.F.R. § 771.115.

For each action that is not a CE and "does not clearly require the preparation of an EIS, or where the Administration believes an EA would assist in determining the need for an EIS" an EA is to be prepared. 23 C.F.R. § 771.119. After following numerous steps to inform the public of its action, and after conducting a thorough environmental analysis to determine the potential for social, economic, or environmental impact, if no significant impacts are identified, the applicant is to furnish the administration a copy and recommend a FONSI. The recommendation is thereafter reviewed by the administration and, if adopted, a FONSI will issue, incorporating the EA by reference. 23 C.F.R. § 771.121(a). If the administration determines at any time in the EA process that the action is likely to have a significant impact on the environment, the regulations direct that an EIS will be required. 23 C.F.R. § 771.120(I).

### (a) NEPA: Standing

[14, 15] Plaintiff's standing to seek judicial review under the APA of an agency's decision not to prepare an EIS as required by NEPA is well established. *E.g. Township* *of Lower Alloways Creek v. Public Service Elec. & Gas Co.,* 687 F.2d 732 (3d Cir.1982); *Concord Township v. United States,* 625 F.2d 1068 (3d Cir.1980); *Shiffler v. Schlesinger,* 548 F.2d 96 (3d Cir.1977); *Public Interest Research Group v. Federal Hwy., Admin.,* 884 F.Supp. 876 (D.N.J.1995). "NEPA does create a discrete procedural obligation on governmental agencies to give written consideration of environmental issues in connection with certain major federal actions and a right of action in adversely affected parties to enforce that obligation." *Aberdeen & Rockfish R. Co. v. Students Challenging Regulatory Agency Procedures,* 422 U.S. 289, 319, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975) (*SCRAP II*). Thus, plaintiff has standing under the APA to seek judicial review of an agency's failure to prepare an EIS under NEPA.

The Court will reserve a zone of interest analysis for the issue of whether plaintiff has standing under the APA to challenge the FTA's failure to prepare an MIS under ISTEA.

### 4. ISTEA Provisions

Sections 1024, 1025, and 3012 of ISTEA, Pub.L. 102–240, 105 Stat.1914, amended title 23, U.S.C., and the Federal Transit Act by revising sections 134 and 135 of Title 23 and section 8 of the Federal Transit Act (49 U.S.C. app. 1607) which require a continuing, comprehensive, and coordinated transportation planning process in metropolitan areas and States. Statewide Planning; Metropolitan Planning, 58 Fed.Reg. 58040 (1993). The relevant section of ISTEA states as its purpose the "national interest to encourage and promote the development of transportation systems embracing various modes of transportation in a manner which will efficiently maximize mobility of people and goods within and through urbanized areas and minimize transportation-related fuel consumption and air pollution." 23 U.S.C. § 134(a). Regulations promulgated pursuant to ISTEA provide that "where the need for a major metropolitan transportation investment is identified, and Federal funds are potentially involved, major investment (corri-

dor or subarea) studies shall be undertaken to develop or refine the plan and lead to decisions by the [metropolitan planning organization], in cooperation with participating agencies, on the design and scope of the investment." 23 C.F.R. § 450.318(a). The FTA and FHWA are responsible for the policies and procedures relating to metropolitan planning organizations (MPOs) as those acts relate to various funding programs. *See* 58 Fed.Reg. 58040.

The metropolitan transportation planning process is to include "a proactive public involvement process that provides complete information, timely public notice, full public access to key decisions, and supports early and continuing involvement of the public in developing plans." 23 C.F.R. § 450.316(b)(1). The regulations state that an MIS "shall evaluate the effectiveness and cost-effectiveness of alternative investments or strategies in attaining local, state and national goals and objectives. The analysis shall consider the direct and indirect costs of reasonable alternatives and such factors as mobility improvements; social, economic, and environmental affects; safety; operating efficiencies; land use and economic development; financing; and energy consumption." 23 C.F.R. § 450.318(c). At a minimum, the MIS is to serve "as input to an environmental impact statement or environmental assessment prepared subsequent to the completion of the study." 23 C.F.R. § 450.318(f)(1). Such analysis "may lead to decisions that modify the project design and scope assumed in the plan development process." 23 C.F.R. § 450.318(g).

An MIS is to be prepared for major metropolitan transportation investments, defined as "transit improvement of substantial cost that is expected to have a significant effect on capacity, traffic flow, level of service, or mode share at the transportation corridor or subarea scale." 23 C.F.R. § 450.104.

The statutory basis for these regulations is 49 U.S.C. § 5309(e)(2):

> The Secretary of Transportation may approve a grant or loan under this section for a capital project for a new fixed guideway system or extension of an existing fixed guideway system only if the Secretary decides that the proposed project is—
>
> (A) based on the results of an alternatives analysis and preliminary engineering;
>
> (B) justified based on a comprehensive review of its mobility improvements, environmental benefits, cost effectiveness, and operating efficiencies; and
>
> (C) supported by an acceptable degree of local financial commitment, including evidence of stable and dependable financing sources to construct, maintain, and operate the system or extension.

However, the source for the regulations regarding the preparation of an MIS has recently been amended by Section 1308 of the Transportation Equity Act for the 21st Century, P.L. 105–78, 112 Stat. 107 (June 9, 1998), which reauthorizes the highway and transit programs through fiscal year 2003. The amendment provides:

> The Secretary shall eliminate the major investment study set forth in section 450.318 of title 23, Code of Federal Regulations, as a separate requirement, and promulgate regulations to integrate such requirement, as appropriate, as part of the analyses required to be undertaken pursuant to the planning provisions of title 23 United States Code, and chapter 53 of title 49, United States Code, and the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) for Federal-aid highway and transit projects. The scope of the applicability of such regulations shall be no broader than the scope of such section.

### (a) ISTEA: Standing

■ The issue of standing under the APA to seek judicial review of an agency's decision not to require an MIS has been largely overlooked, although this must in part be attributed to the relative youth of ISTEA. The opinion coming nearest to addressing the issue comes from our own district. *See Town of Secaucus v. United States Dept. of Transp.*, 889 F.Supp. 779 (D.N.J. 1995), *aff'd without opinion*, 79 F.3d 1139 (3d Cir.1996). In *Secaucus*, however, the Court addressed primarily the Article III requirements of standing, and not specifically

whether plaintiff's alleged injury fell within the zone of interests arguably to be protected under ISTEA. *Id.* at 788–89. Likewise, in *Clairton Sportsmen's Club v. Pennsylvania Turnpike Commission,* 882 F.Supp. 455 (W.D.Pa.1995), the Court considered the merits of plaintiff's MIS claim under the APA, but did not address the prudential standing requirement. *Id.* at 463. A few courts have declined to review an agency's decision under ISTEA because the act has been held not to provide a private right of action.[7]

That conclusion is separate from whether plaintiff in this case has standing to seek review of an agency's decision not to prepare an MIS under the APA based on an alleged violation of ISTEA.

The APA contains " 'generous review provisions.' " *Bennett v. Spear,* 117 S.Ct. at 1161 (quoting *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 400 n. 16, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (other citation omit-

ted)). In order for an injury to be reviewable, it must fall within "the meaning of a relevant statute." 5 U.S.C. § 702. The relevant statute here is ISTEA and its provisions regarding when an MIS is required. The simple issue is whether plaintiff's interest in requiring an MIS is " 'arguably within the zone of interests' " to be protected by the MIS provisions of ISTEA. *See National Credit Union Admin.,* 118 S.Ct. at 933. It is irrelevant to the analysis to question whether, in enacting the provisions, "Congress specifically intended to benefit the plaintiff." *Id.* 118 S.Ct. at 935. Rather, the Court is to conduct a two part inquiry: first, what interests are arguably to be protected by the statutory and regulatory provisions, and second, whether the plaintiff's interests "affected by the agency action in question are among them." *Id.*

A consideration of the relevant portions of ISTEA reveals that the Secretary of Transportation is only to approve a grant or loan for a capital project or extension of an exist-

7. Defendants' argument that plaintiff's ISTEA claim is prohibited because ISTEA does not provide a private right of action mistakes the issue, and their reliance on *Town of Secaucus,* 889 F.Supp. at 788, and *Sierra Club v. Pena,* 915 F.Supp. 1381 (N.D.Ohio 1996), *aff'd by Sierra Club v. Slater,* 120 F.3d 623 (6th Cir.1997), is misplaced. Determining that no private right of action exists under ISTEA is considerably different from concluding that plaintiff is unable to obtain judicial review under the APA. NEPA also does not create a private right of action, but judicial review of NEPA violations under the APA is available. *See National Wildlife Federation,* 497 U.S. at 882–83, 110 S.Ct. 3177 (noting that the APA may provide a right to sue if final agency action causes an injury to plaintiff within the " 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint"); *Sierra Club v. Slater,* 120 F.3d at 630 ("NEPA does not authorize a private right of action. . . . The [APA], however, provides for judicial review of agency action [and][w]e have long recognized that federal courts have jurisdiction over NEPA challenges pursuant to the APA"); *Florida Audubon Soc'y,* 94 F.3d at 665 (acknowledging that NEPA does not provide private right of action and examining whether, under the APA, plaintiff had established requisite elements of standing); *Southwest Williamson County Community Assoc. v. Slater,* 976 F.Supp. 1119, 1122 (M.D.Tenn.1997) (pointing out that no private right of action exists under NEPA and considering challenge under the APA).

In fact, a careful reading of *Town of Secaucus, supra,* leads to the conclusion that Judge Debe-

voise did not hold that violations of ISTEA could not be challenged under the APA. In *Secaucus,* plaintiffs had brought their claim solely under ISTEA and were dismissed due to ISTEA's failure to provide a private right of action. 889 F.Supp. at 788. In considering whether an amendment of the complaint to include a claim under the APA would still require dismissal, the Court, however, specifically found that plaintiffs would have had standing. *Id.* at 789. Despite this conclusion, Judge Debevoise did not allow the amendment because the Court undertook an evaluation of the merits of plaintiffs' claims (as if brought under the APA) and found that, "[since plaintiffs [were] not entitled to relief under the APA, their proposed amendment would be futile.]" *Id.* at 790.

The defendants' reliance on *Sierra Club v. Pena, supra,* and *Sierra Club v. Slater, supra,* is equally unavailing. The Court in *Pena* conducted no analysis as to whether the plaintiffs had standing under the APA to challenge violations of ISTEA. The Court's recognition that NEPA claims could be pursued under the APA, while simultaneously dismissing the ISTEA claim because of a lack of a private right of action, is most likely attributable to the failure of the plaintiffs to argue standing under the APA to challenge ISTEA violations. In *Slater,* the Sixth Circuit Court of Appeals noted simply that appellant had not challenged the district court's finding of no private right of action. *Sierra Club v. Slater,* 120 F.3d at 629. In any event, the silence of those opinions with regard to the issue of standing under the APA to challenge ISTEA violations is no assistance to defendants in this case.

ing fixed guideway system if the Secretary concludes that it is "justified based on a comprehensive review of its . . . environmental benefits, costs effectiveness, and operating efficiencies", and "based on the result of an alternatives analysis and preliminary engineering". 49 U.S.C. § 5309(e)(2)(a-b). The metropolitan transportation planning process is to include "a proactive public involvement process that provides complete information, timely public notice, full public access to key decisions, and supports early and continuing involvement of the public in developing plans." 23 C.F.R. § 450.316(b)(1). At a minimum, the MIS is to serve "as input to an environmental impact statement or environmental assessment prepared subsequent to the completion of the study" in order to allow appropriate modification of the project. 23 C.F.R. §§ 450.318(f)(1) & 450.318(g). The MIS analysis is to "consider the direct and indirect costs of reasonable alternatives and such factors as . . . social, economic, and environmental affects; safety; . . . [and] land use and economic development." 23 C.F.R. § 450.318(c).

The import of the MIS requirement appears clear. It protects both local and state interests by insuring local and state officials the ability to participate in a meaningful way in the planning process leading up to projects that will directly affect their interests. Interests sought to be protected include the social, economic, safety, and environmental interests of those impacted by major metropolitan transportation investments receiving federal funds.

In the instant matter, plaintiff is the Township of Belleville. Township officials have an interest in requiring the FTA to base its decision on an MIS before it issues a FONSI, which would allow federal funds to flow to a project[8] that will occur in large part within the plaintiff's borders. Primarily, the interest is one of participation in the planning process. Subsumed in this interest are the plaintiff's interests in insuring that reason-

able alternatives be considered and that potential significant impacts of the project be scrutinized.

Based upon this inquiry, the Court concludes that the interests raised by plaintiff arguably fall within the zone of interests sought to be protected by the ISTEA provisions. The Court finds further support for its position in the recent amendment of the Transportation Equity Act, P.L. 105–78, 112 Stat. 107, which eliminates the separate MIS requirement, but mandates an MIS, as appropriate, as part of the analysis required under NEPA. Although regulations have yet to be adopted implementing the amendment, the language of the new law would seem to further plaintiff's standing in this case, where plaintiff also seeks to insure that a "hard look" has been taken at the environmental consequences of the action under NEPA.

## B. Summary Judgment

Having determined that plaintiff has standing to bring its suit, the Court next considers the parties' summary judgment motions. Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Prods., Co.,* 789 F.2d 230, 232 (3d Cir.1986).

This is an administrative review case. The Court finds no genuine dispute of material facts in the record and affidavits submitted by the parties. *See Clairton Sportsmen's Club v. Pennsylvania Turnpike Commission,* 882 F.Supp. 455, 463 (W.D.Pa.1995). Rather, the parties urge different conclusions based on their characterizations of the same facts. The real issue to be decided summarily is whether and to what degree the FTA complied with the procedural requirements of NEPA and ISTEA. *See id.*

---

8. Whether the project is a major metropolitan transportation investment requiring an MIS is a matter of close dispute, but the Court finds that the project arguably satisfies the definition for purposes of standing, which is a prerequisite to

review. Accordingly, the interests raised by plaintiff arguably come within the zone of interests to be protected under the MIS provisions, including the definition of a major metropolitan transportation investment.

## C. Scope of Review Under the APA

The scope of review under the APA is described as follows:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the forgoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

In applying these directives, the Third Circuit has repeatedly declined to decide whether the appropriate standard of review to apply to an agency's decision not to prepare

an EIS [9] is an "arbitrary or capricious" standard, or one of "reasonableness." *See State of New Jersey Dep't of Envtl. Protection and Energy v. Long Island Power Auth.*, 30 F.3d 403, 415 (3d Cir.1994); *Morris County Trust for Historic Preservation v. Pierce*, 714 F.2d 271, 278 n. 5 (3d Cir.1983); *Township of Springfield v. Lewis*, 702 F.2d 426, 436 (3d Cir.1983); *Township of Lower Alloways Creek v. Public Service Electric & Gas Co.*, 687 F.2d 732, 742 (3d Cir.1982).

Despite the lack of endorsement for either standard, the Third Circuit has commented on the issue:

Some courts, recognizing that an initial decision to omit the preparation of an Environmental Impact Statement may bypass the direction of NEPA to consider environmental factors "to the fullest extent possible", have concluded that such a decision must be subject to a more searching judicial inquiry than the review of the merits of agency action after preparation of an impact statement. These courts reason that the National Environmental Protection Act is not merely a full disclosure law but one designed to effect substantive changes, and thus the policy of the Act requires that the decision not to prepare an impact statement should be measured by its reasonableness in the circumstances. That standard of review is far less deferential to the agency than the arbitrary and capricious standard of section 706(2)(A) of the Administrative Procedure Act.

... This court has reserved decision on the appropriate scope of review of a threshold agency decision not to prepare an impact statement. The district courts in this circuit tend to apply the higher standard of reasonableness to such threshold determinations. There is much to be said in favor of subjecting these threshold determinations to the higher scrutiny on review.

9. The Third Circuit has not spoken with regards to the standard of review to be used when reviewing an agency's decision not to prepare an MIS. In fact, this Court has uncovered only one case that allowed suit under ISTEA for failure to prepare an MIS. *E.g. Clairton Sportsmen's Club v. Pennsylvania Turnpike Commission*, 882 F.Supp. 455 (W.D.Pa.1995) (appearing to use

"reasonableness" standard, *id.* at 481, for failure to prepare a separate MIS under ISTEA, but using "arbitrary" and "capricious" standard when simply reviewing procedures used to develop EIS under NEPA, *id.* at 466. The Court distinguished between failure to prepare a document and review of document already prepared).

*Concord Township v. United States,* 625 F.2d 1068, 1073–74 (3d Cir.1980) (footnotes omitted).

Because the FTA's decision to issue a FONSI in this case passes muster under either standard of review, it is unnecessary for this Court to choose one standard over another. In these circumstances it is appropriate to apply the reasonableness standard, and the FTA's decision will be upheld absent a showing that it acted unreasonably in issuing a FONSI without requiring an EIS or MIS to be prepared. *See Public Interest Research Group* 884 F.Supp. at 887 (noting that Third Circuit jurisprudence is controlling and applying the reasonableness standard of review) (citing *Lower Alloways Creek,* 687 F.2d at 742 (citing *Concord Township,* 625 F.2d at 1073)).

## D. The Merits

### 1. NEPA

 Plaintiff argues that the FTA's decision to issue a FONSI violated NEPA. First, plaintiff charges that the plain language of the regulations required an EIS to be prepared. Second, plaintiff argues that the FONSI should not have been issued because NJT failed to properly examine alternatives to the project and failed to adequately evaluate the environmental impacts of the project.

 Prior to analyzing the NEPA process, the Court emphasizes its limited role in such inquiry. "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). When conducting its analysis under NEPA, the agency is not required, nor would it be desirable, to elevate environmental concerns over other appropriate considerations. *Id.* Rather, the requirements of NEPA simply are meant to insure that the "agency has taken a 'hard look' at environmental consequences." *Kleppe v. Sierra Club,* 427 U.S.

390, 406, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (citation omitted). If the Court finds that the agency has fulfilled these requirements, the Court must not " 'interject itself within the area of discretion of the executive as to the choice of the action to be taken,' " but must affirm the agency action chosen. *Id.* (citation omitted). Were the Court to find a violation of NEPA, however, the matter should be remanded to the agencies. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).

### (a) Class of Project

Plaintiff's main support for its argument that the regulations require an EIS to be prepared is 23 C.F.R. § 771.115(a), which states that "examples of actions that normally require[ ] an EIS," *i.e.,* "CLASS I" projects, include:

(3) New construction or extension of fixed rail transit facilities (e.g., rapid rail, light rail, commuter rail, automated guideway transit).

Plaintiff argues that a plain reading of this regulation requires an EIS.[10]

Defendants also rely on the language of the regulations. They point out that actions that do not have significant environmental effects are "CLASS II", which are categorically excluded from the requirement for an EIS or EA. 23 C.F.R. § 771.115(b). The list of examples of categorical exclusions includes "construction of rail storage and maintenance facilities in areas used predominately for industrial or transportation purposes, where such construction is not inconsistent with existing zoning and where there is no significant noise impact on the surrounding community," 23 C.F.R. § 771.117(d)(11), and "track and railbed maintenance and improvements when carried out within the existing right of way," 23 C.F.R. § 771.117(c)(18). The base facility site is zoned for industry, and the short segment of rail improvement that will be carried out in Belleville will take

---

**10.** Plaintiff also cites to portions of the Federal Register as support for concluding that the project required the preparation of an EIS as a matter of law. *See* 52 Fed.Reg. 32646, 32650–51. Although the comments in the Federal Reg-

ister are informative, they are merely advisory and leave to the agency a case-by-case determination of when certain rail extensions require an EIS.

place within the existing right-of-way owned by Conrail. Thus, the defendants contend that, arguably, the project could have been classified as a categorical exclusion, requiring neither an EIS or EA.

The defendants further emphasize that, in order to insure their satisfaction of NEPA, the FTA chose a conservative approach and required an EA for the project according to the regulations defining "CLASS III" projects. Those regulations provide that, where it is not clearly established whether a project proposed for FTA funding will have a significant impact, an EA is to be performed to determine the appropriate environmental document required. 23 C.F.R. § 771.115(c).

According to the Court's reading of the regulations and the record, the FTA acted reasonably in requiring an EA to be prepared. The base facility is to be constructed on a site zoned for industrial purposes. That portion of the project falls squarely within the categorical exception. The upgrading of the Conrail track to two tracks [11] within the right of way would normally also fall within the categorical exclusion, but a question remained as to whether the environmental impacts due to the extension of subway service and increase in activity on the tracks would be significant. Accordingly, the FTA was correct to classify the project as a "Class III" ("[a]ctions in which the significance of the environmental impact is not clearly established") and require an EA to be prepared to determine the appropriate environmental document required. 23 C.F.R. § 771.115(c).

### (b) EA Conclusions

Plaintiff next challenges the finding of the EA that an EIS was not required for the project. Plaintiff argues that the FTA should have required an EIS because the EA failed to consider reasonable alternatives and failed to adequately evaluate likely significant environmental impacts of the project. An EA is intended to "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). It is to include "brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).

### (1) Alternatives

■ The main thrust of plaintiff's inadequate-alternative-analysis argument is that the EA failed to consider grade separation of the project in the Silver Lake area, specifically, at the Belmont–Franklin crossing.[12]

■ Investigating reasonable alternatives is, without doubt, a primary obligation imposed under NEPA. *See* 42 U.S.C. § 4332(2)(E). The concept of alternatives under NEPA, however, "must be bounded by some notion of feasibility" and "common sense." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

> "NEPA's requirement of a discussion of alternatives ... should be superintended according to a 'rule of reason.'" Stated another way, "[t]he degree to which an existing alternative should be considered, or indeed whether an alternative should be considered at all, varies with existing circumstances." The "rule of reason necessarily governs *which* alternatives the agency must discuss, and the *extent* to which it must discuss them." Reasonableness is

---

**11.** Apparently two tracks currently exist, but one is no longer used and is in disrepair.

**12.** The Court finds plaintiff's argument that the defendants "artificially limited the universe of potential sites by insisting on a 13–15 acres site when internal documents indicate a smaller site would suffice or that a larger site could be procured simply by acquiring adjacent property" wholly without merit. *See* Plaintiff's Brief at 18–20, Plaintiff's Opposition Brief at 18, Plaintiff's Amended Statement of Facts, ¶ 14. The Screening and Selection Process of the Technical Report (Defs.App., Vol II at 2–1 to 2–2) clearly specifies that the base facility site requires a level area of about 13 to 15 acres. *See also* List of Potential Property Acquisition Tables, Defs.App., Vol II. at 3–27 to 3–30 (wherein it is clear that the total property acreage sought to be acquired for this project exceeds 15 acres). The Technical Report also clearly explains why the Franklin Street Site is the preferred alternative. *See also* Jerome Lutin, Senior Director of Planning, Research and Development for NJT, aff. at 9–10.

measured by whether it achieves the goals the Agencies set out to achieve.

*Clairton Sportsmen's Club,* 882 F.Supp. at 477.

■ When considering lack of examination into an alternative, the Court bears in mind that the appropriate inquiry normally resides within the administrative record, which includes all materials compiled by the agency, and before it, at the time the decision was made. *Sierra Club v. Slater,* 120 F.3d at 638. While the Court is to view critically post-hoc reasons offered for an agency's actions or inaction, *see National Wildlife Federation v. Hanson,* 623 F.Supp. 1539, 1544–45 (E.D.N.C.1985), in some circumstances it may be obvious from the record and entirety of the facts that there was no need for express explanation by the agency. *See City Federal Sav. & Loan Ass'n v. Federal Home Loan Bank Bd.,* 600 F.2d 681, 689 (7th Cir. 1979).

In the instant case, the Court notes that the defendants considered grade elevation of the entire project from Heller Parkway to the base facility. Grade elevation was found impractical for sound engineering, economic, and environmental reasons. *See* Plaintiff's App. 19 (NCS Access Track and Vehicle Base Facility Evaluation of LRT Aerial Alignment). The defendants did not specifically include in the grade elevation document an analysis of grade separation solely at the Belmont–Franklin crossing. The omission of this analysis, however, is not fatal if reasonable in light of the record.

Although it should not be considered plaintiff's responsibility to suggest alternatives, it should be noted that plaintiff was given ample opportunity to voice its opinions and objections to the project. Despite the availability of the grade separation study, at no point during the preparation of the EA did the plaintiff ask NJT to study the feasibility of grade separation solely at the Belmont–Franklin crossing.

More critical to determining the reasonableness of the EA's omission, however, is the fact that the record indicates that grade separation at the Belmont–Franklin Street crossing is impractical. Plaintiff has offered a half page memorandum, composed by the Township Engineer, which appears to acknowledge that grade separation above the crossing is impractical. Pl.App. 20. Thomas J. Herits Memo ("It is our understanding that NJ Transit has already investigated the option of a grade separation over said roadways and concluded it was impractical due to available right-of-way and engineering alignment difficulties"). The Township Engineer goes on to further assert that "after a very preliminary inspection it appears that the option of going under the said roadways may be feasible." The *paragraph* offered in support of this conclusion, however, does not address the very problems evident from the record that weighed against elevating the project over the roadways: namely, (1) that the freight right of way is at grade and must remain that way, (2) that without the use of the freight rail, the project would require the construction of *two* below ground tracks, requiring considerable acquisition or condemnation of private property in Belleville, (3) the technical difficulty facing the realignment of the track and the required curvature beneath the Belleville crossings, (4) the restriction of ingress and egress to the yard, thus compromising intended yard flow and creating congestion in the yard, and (5) the obvious increase in cost. *See* Plaintiff's App., 19 (NCS Access Track and Vehicle Base Facility Evaluation of LRT Aerial Alignment) at 1–3. Based on these facts of record, the Court cannot find fault with NJT's failure to examine grade separation further. It must be acknowledged that requiring an agency to investigate an allegedly suitable alternative that is, in reality, not a suitable alternative at all, would contravene all prudence and good sense. The grade separation study prepared, although it did not specifically examine grade separation only at the Belmont–Franklin crossing, provided the agency with adequate information with which it could determine that grade separation was infeasible. In light of the evidence before the agencies, the Court finds the omission of a grade separation analysis regarding the Belmont–Franklin crossing patently reasonable.

**(2) Environmental Impacts**

■ Plaintiff argues that there is a substantial possibility of significant impacts from

the project, and that the FTA acted unreasonably in issuing a FONSI for the project based on the EA, without requiring an EIS. The parties spend a good portion of their briefs debating the significance of the project's impacts.

### (a) Traffic

■ Plaintiff charges that the project will cause significant traffic congestion in the area around the Belmont–Franklin signalized intersection. In some circumstances, traffic congestion can amount to significant environmental impact requiring an EIS. *See United States v. 27.09 Acres of Land,* 760 F.Supp. 345, 351 (S.D.N.Y.1991).

■ According to the full build-out analysis of the EA,[13] the subway would operate on a three-minute headway (one vehicle crossing each 1.5 minutes) during peak hours.[14] (EA at 3–8).

The intersection capacity analysis assumes an exclusive LRT phase with 21 seconds of green time for the LRT to cross the street, except at the Franklin Street and Belmont Avenue intersections. Since these intersections are adjacent to each other and operate as one intersection, 30 seconds of green time are allocated for the exclusive LRT phase. This will allow the LRT to cross the intersection without having the intersection blocked by queued vehicles. The traffic mitigation assumes that the LRT grade crossings would use traffic signals and not gates and the LRT vehicles

would operate at a maximum speed of 25 miles per hour.

(Technical Report at 4–10).

Current levels of service at the Belmont–Franklin intersection are classified as "C".[15] (Technical Report at 4–5 to 4–6). The level of service predicted in 2015 with the no-build alternative remains the same. Without mitigation, the level of service predicted in the full build-out option in 2015 is "F". With mitigation, the level of service in the full build-out option in 2015 during peak hours is described as "C" in the morning and "D" in the evening. (Technical Report at Table 4–4).

The mitigation suggested for the Belmont–Franklin intersection is described in the Table as follows:

Change signal timing/phasing cycle length & eliminate four parking spaces south side of Franklin Street east of Belmont Avenue, and two spaces north side of Franklin Street, west of Belmont Avenue.

(Technical Report at Table 4–4).

Mitigation is discussed more fully in the Technical Report under "Mitigation Plan":

Mitigation measures for the at-grade LRT crossing of Franklin Street and Belmont Avenue have been carefully considered and would result in no significant impacts due to any of the alternatives. The two at-grade crossings are approximately 500 feet (152.4 meters) apart. Together with the signalized intersection of Franklin Street and Belmont Avenue, the two LRT grade crossings form a "triangle" of about 250

---

**13.** The Technical Report charts current levels of service at intersections and predicts level of service in 2015 by analyzing a no-build alternative as well as three build alternatives. For purposes of review, the Court considers the full build-out option as that proposal would entail the most impact.

**14.** Defendants have since modified the project's operation plan to accommodate the plaintiff, including downgrading the service on the line to a six-minute headway. The Court must consider the EA as it existed before the FTA when it made its decision to issue a FONSI. *Marine Transp. Servs. Sea–Barge Group, Inc. v. Busey,* 786 F.Supp. 21, 27 (D.D.C.1992); *Wyoming Hosp. Ass'n v. Harris,* 527 F.Supp. 551, 559 (D.Wyo. 1981), *affirmed,* 727 F.2d 936 (10th Cir.1984).

This Opinion makes reference to the modified operating plan in its conclusion.

**15.** There are six levels of service designations used for intersections:

LOS A denotes free-flowing conditions with no congestion.
LOS B is also free-flowing, with minor congestion.
LOS C is considered stable flow with noticeable but acceptable levels of congestion.
LOS D is considered marginally acceptable.
LOS E is approaching possible capacity with congestion at an unacceptable level and,
LOS F is exceeding capacity which represents failure or breakdown conditions with extreme congestion.

(Technical Report at 4–5).

feet (76 meters) to the southwest. Selected mitigation measures for Options 2 and 3 consist of the following (see Figure 4–3):

- Change signal phasing for the intersection of Belmont Avenue/Franklin Street to Accommodate revised traffic movements
- Provide left turn/through lane for westbound Franklin Street to southbound Belmont Avenue.
- Restrict parking on south side of Franklin Street between Belmont Avenue and Heckel Street and north side of Franklin Street between the two Belmont Avenue approaches. This will provide an additional southbound lane. Replacement parking will be created on Heckel Street in the proposed cul-de-sac and additional replacement off-street parking can be created on Franklin Street north of Belmont Avenue, on land acquired for the VBF.
- Signalize all LRT grade crossings:
 — Franklin Avenue
 — Franklin Street
 — Belmont Avenue
 — Grove Street
- Allow right-turns only for westbound traffic on Watchung Avenue
- Cul-de-sac Heckel Street at Franklin Street

. . .

Detailed mitigation measures for all options are listed on Table 4–4; this post-mitigation LOS analysis indicates all intersections operate at the same or an acceptable level of service when compared to existing operation.

(Technical Report 4–17 to 4–19).

 "An EIS need not be done '[i]f a mitigation condition eliminates all significant environmental effects.'" *Virgin Islands Tree BOA v. Witt,* 918 F.Supp. 879, 898 (V.I.1996) (citation omitted), *affirmed,* 82 F.3d 408 (3d Cir.1996); *Roanoke River Basin Ass'n v. Hudson,* 940 F.2d 58, 62 (4th Cir.1991), *cert. denied,* 502 U.S. 1092, 112 S.Ct. 1164, 117 L.Ed.2d 411 (1992).

"[C]ourts permit the effect of mitigation measures to be considered in determining whether preparation of an EIS is necessary." *Friends of the Earth v. Hintz,* 800 F.2d 822, 836 (9th Cir.1986) (citations omitted), *affirmed,* 800 F.2d 822 (9th Cir.1986).

In the present case, the EA submitted to the FTA provides a detailed analysis of the traffic impacts of the project. The mitigation measures were included with the original proposal to the FTA and are comprehensive. They indicate that the project, with mitigation, will not create significant environmental impact even in the full build-out option.[16] The sole impact on level of service in 2015 in the full build-out mode will be to shift the level of service to a "D" from a "C" classification in the peak hours of the evening, which is still acceptable and can not be considered significant. (Technical Report Table 4–4). The reference of the plaintiff to a study conducted for another rail line and the traffic analysis provided for a retail store in Belleville are simply not sufficient to refute the EA's thorough analysis. Accordingly, the Court finds reasonable the EA's conclusion that the project will not cause significant environmental impacts in terms of traffic.

**(b) Pedestrian Safety**

Plaintiff objects that the project will endanger pedestrians. This argument deserves consideration as it is obvious that rail activity may pose hazards to pedestrians. The difficulty the Court has with plaintiff's position, however, is that the plaintiff offers nothing but its own, and the opinion of its engineer, final conclusion that such action poses any likelihood of significant environmental impact. Plaintiff and its expert offer no additional studies to support its conclusion. Rather, it relies on the very EA and Technical Report utilized by the FTA in making its decision, but reaches an opposite determination.

 "The burden of establishing substantial environmental issues is on the Plaintiffs." *Public Interest Research Group,* 884 F.Supp. at 888 (citing *Lower Alloways Creek,* 687 F.2d at 742 n. 24). "'An agency's careful

---

**16.** The full build-out option includes a station in Belleville. NJT has expressed to Belleville that it will only construct such a station at Belleville's request.

evaluation of the impact of its proposed action, its collection and review of evidence, and its reasoned conclusions as to what the dat[a] reveals would be for naught if by simply filing suit and supplying an affidavit by a hired expert, predicated upon the same facts relied upon by the agency but reaching a different conclusion, a litigant could create a controversy necessitating an EIS.'" *Id.* at 891 (quoting *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1335 (9th Cir.1992)). Further, "[b]ecause analysis of the relevant documents 'requires a high level of technical expertise,'" some deference should be accorded " 'the informed discretion of the responsible federal agencies.'" *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)(quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)).

In contrast to plaintiff's position, the Technical Report explains the foundation for its analysis and its conclusion:

> Grade crossing safety does not create a significant impact under any of the build alternatives. An analysis of grade crossing safety was conducted. Traffic counts were conducted at all grade crossing locations and preliminary grade crossing plans were developed by traffic engineers to confirm the feasibility of the crossings. Operational and traffic data from existing Newark City Subway light rail grade crossing experience were analyzed to confirm that proposed modification will ensure safe operations.

(Technical Report at 4–16). The findings of the Technical Report were that the safety conditions, as they currently exist, are dangerous:

> At present, significant numbers of pedestrians make dangerous mid-block crossings of Franklin Avenue at the proposed LRT crossing to access the Franklin Avenue NCS station as their "shortest" path. There are no warning signs posted advising motorists of the pedestrian activity at this location. Also, pedestrian activity was observed at bus locations in the area.

(Technical Report at 4–7).

Although a pre-existing hazard is never justification for the advent of new danger,

the conclusion of the Technical Report is that "[t]hree-minute headways ... during peak hours would result in slight pedestrian delays, but safer grade crossings due to the installation of signals." (Technical Report at 4–15). The report does not base this conclusion on mere speculation. Rather, the build alternative to grade crossings reflects that the preparers of the Technical Report and EA consulted past experience in making their conclusions:

> The Newark City Subway has one at-grade crossing at Orange Street in Newark that has been in continuous service since the opening of the Subway over sixty years ago. The Orange Street grade crossing uses standard traffic signal heads facing both vehicular traffic and the light rail vehicles. Light rail vehicles actuate the crossing signals using track circuits. In addition, light rail vehicles approach the crossing at low speed and stop prior to crossing the street.

> Accident reports for the Orange Street crossing are available for the past ten years. Since 1986 one grade crossing accident has been reported, in which an auto rolled back into a passing light rail vehicle. Records show no fatalities, no injuries, and no incidents in which a rail vehicle collided with an auto or pedestrian.

> During the ten year period for which records are available, there were 1,576,640 light rail vehicle crossings and 6,480,000 revenue vehicle miles operated. Traffic counts at Orange Street indicate that current peak hour volume in both directions averages approximately 1,000 vehicles, which closely approximates maximum peak hour traffic conditions for grade crossings on the proposed extension. Orange Street also involves heavy pedestrian crossing volumes since Orange Street Station passenger platforms are located adjacent to both sides of the crossing.

(Technical Report at 4–16 to 4–17).

It is thus clear that the authorities responsible for preparing the EA and Technical Report based the recommendation of a finding of no significant impact upon empirical data collected from the proposed site, institu-

tional data collected from a similar project, and the expertise of the preparers of the documents. In light of the evidence, the deference owed the safety engineers, and the absence of conflicting evidence regarding pedestrian safety, the Court holds the EA's finding of no significant impact reasonable with regard to safety.

### (c) Other Impacts/Public Outreach

Contrary to the plaintiff's contentions, the EA adequately considered parking, noise, vibration, visual, property tax, and construction related impacts and found them to be insignificant, or insignificant with appropriate mitigation. The Court will not disturb these conclusions as they are clearly reasonable. Further, the defendants have conducted public outreach as required under NEPA. The record reveals substantial notification to the community and considerable opportunity for plaintiff to voice its views on the project. The Court notes that public outreach continues.

### 2. ISTEA

 Plaintiff argues that the FTA violated ISTEA by not preparing a separate MIS for the project.[17]

The District Court in *Clairton Sportsmen's Club v. Pennsylvania Turnpike Commission*, 882 F.Supp. 455, 480 (W.D.Pa.1995) discussed 23 C.F.R. § 450.318, which requires "that major investment studies be made on the 'design concept and scope of the investment,' investment meaning the transportation project being considered." In *Clairton*, the environmental review process for the highway project at issue had begun prior to the enactment of the MIS requirement. In examining whether a separate MIS should have been required, the Court took note of 23 C.F.R. § 450.318(i), which provides that

"[w]here the environmental review process has been initiated but not completed, the Federal Highway Administration (FHWA) and the FTA shall be consulted on appropriate modifications to meet the requirements of this section." *Id.* Applying the regulation to the facts in that case, the *Clairton* Court agreed with the FHWA that, given the degree of study already undertaken and the project's progress, a separate MIS was not required. *Id.* at 481.

The reasoning of *Clairton* applies in this case. The Draft Statement of Approach for the Newark–Elizabeth Rail Link Major Investment Study, published in 1995, states that "NJ Transit launched a two-year MIS which was concluded in June 1993,[18] prior to the adoption of the [North Jersey Transportation Planning Authority (NJTPA)] MIS procedures. However, the project was specifically scoped to comply with the MIS guidelines promulgated by the Federal Transit Administration." (Defs.App.V, Ex. B.). The Franklin Street Site located on the Belleville/Bloomfield border was explicitly considered as a component of the NERL MIS because, at that time, the vehicle base facility and rail extension was contemplated as part of the NERL project.[19] (Defs.App. V, Ex. C.). In addition to the NERL MIS, a separate NERL Options Study was prepared in October, 1994, specifically in order to consider further the Franklin Street site proposed for the base facility. (*See* "NERL Options Study, Franklin Street Vehicle Base Facility Site and Access Alternative Study", Defs.App. V., Ex. N). "Since NJ Transit had concluded the MIS work in early 1994, one year prior to the adoption of the NJTPA MIS procedures, Central Staff determined that the Newark Elizabeth Rail Link project had complied with MIS requirements and that no further work was required by the

---

**17.** Although the Court has stated that the project arguably satisfies the definition of a major metropolitan transportation investment for purposes of prudential standing, the Court need not determine the issue, ultimately, because the Court finds that a separate MIS was not required in any event, whether or not the project satisfied the definition.

**18.** The MIS was entitled "Newark–Elizabeth Rail Link Options Study, June 1993". It is included

in full at Volume VI of the Appendix to defendants' brief.

**19.** In November, 1994, NJT notified the FTA that a new base facility would be required for the Subway, regardless of whether the NERL system was ever constructed. (FTA's Statement in Compliance with Local Rule 56.1 at 5). The base facility project was thereby advanced as a separate project.

study sponsor beyond completion of the NEPA process already under way." (Defs. App.V, Ex. A.).

Based on the Court's reading of 23 C.F.R. § 450.318(i), the FTA acted within the parameters of the regulations in determining that a separate MIS was not required for the project. It is clear that the Franklin Street site was considered in the NERL MIS and that plaintiff had an opportunity to comment upon the project at that time. In addition, the October, 1994 NERL Options Study, "Franklin Street Vehicle Base Facility Site and Access Alternative Study," further documents a detailed study of the site. To conclude that the FTA should have required another separate MIS to be prepared in regards to the exact same site that had already been considered in the NERL MIS and 1994 NERL Options Study, simply because the Franklin Street site was later forwarded under the Newark City Subway project, would serve no good purpose and promote an extreme waste of resources. No suggestion is made that circumstances around the site have changed. Consequently, no supplemental information is needed. The FTA has an obligation to avoid the needless duplication of environmental studies and to allocate its resources to issues deserving of further review. See 23 C.F.R. § 420.105 (stating the policy of "[m]aximum possible flexibility in the use of FHWA planning and research funds to meet highway and multimodal transportation planning ... while ensuring legal use of such funds and avoiding unnecessary duplication of its efforts"). Requiring a separate MIS at this point would contradict this directive as the Franklin Street site has been previously identified and studied in an MIS, and considered separately in an Options Study.[20]

The Court determines that the FTA acted reasonably in not requiring a separate MIS to be prepared.

## DISPOSITION OF MOTIONS

Based on the foregoing analysis, the Court finds that the FTA acted reasonably in issuing a FONSI and grants defendants' motions for summary judgment. In light of the summary judgment result, it is clear that plaintiff has shown no likelihood of success on the merits; accordingly, its motions for preliminary and permanent injunctive relief, and for summary judgment, will be denied. The defendants' motion to dismiss will be granted. There is no need to consider the defendants' arguments based on laches and the entire controversy doctrine.

## CONCLUSION

The plaintiff in this case is a township challenging alleged procedural violations of federal statutes and regulations by the FTA in approving a project that will allow light rail service within the township's borders. The project will, without doubt, have an impact on plaintiff. These impacts, however, have been analyzed and considered by the agencies charged with such evaluation in the EA and Technical Report, as well as in a previous MIS and Options Study. The EA concluded that, although impacts will occur, they do not rise to significant environmental impacts requiring an EIS. Although reasonable minds can disagree over the degree of "significance" produced by the project, it would be an overreach for this Court to interject its own personal value system on the agencies charged with making the appropriate determinations. To do so would represent an unwarranted attempt to supplant the executive branch with the judicial, and blur their two roles, the result of which would be to diminish the function of both. Instead, the Court's task is solely to determine whether the FTA's finding of no significant impact was reasonable when considered in light of the relevant provisions of NEPA and ISTEA. Because the Court so finds, the FTA's decision to issue a FONSI for the project must be upheld.

The Court's conclusion that the FTA acted reasonably in issuing a FONSI does not

---

**20.** Further, Congress has required the Secretary to eliminate the MIS as a separate requirement, and directed regulations to be prepared integrating the MIS requirement, as appropriate, as part of the analysis under NEPA. See Section 1308 of the Transportation Equity Act for the 21st Century, P.L. 105–78, 112 Stat. 107 (which reauthorizes the highway and transit programs through fiscal year 2003). As the Court has already found that the NEPA process was satisfied in this case, there is even less reason to require a separate MIS here.

## 805

lessen NJT's obligations to work closely with the township to alleviate its concerns. It is anticipated that further communication between the two will allow the plaintiff to accept the reasonableness of the agency's actions. The Court notes that the April 1998 adoption by NJT of a modified operating plan to accommodate the plaintiff—reducing LRV service to a six minute headway during peak hours, requiring the LRVs to stop for local traffic signals, and placing the speed limit on the LRVs to no more than 10 m.p.h. during crossing—is the type of positive remedial concern that should help to alleviate plaintiff's lingering doubts as to the project.

Intuitively, it is clear that an action may be reasonable and environmentally sound, yet simultaneously viewed as undesirable by the party upon who the majority of the impact (even if not significant) is felt. The desire to protect one's personal space and property is understandable and should be accorded respect. Notwithstanding these proprietary instincts, a reasonable balance must be struck between the local protective urge and the competing interest of public works for the public good. Because the FTA's grant of a FONSI was reasonable here, the Court will affirm the agency's decision.

An appropriate Order is attached.

### GLOSSARY

| | |
|---|---|
| ADA | - Americans with Disabilities Act |
| APA | - Administrative Procedure Act |
| EA | - Environmental Assessment |
| EIS | - Environmental Impact Statement |
| FONSI | - Finding Of No Significant Impact |
| FTA | - Federal Transit Administration |
| HBLRTS | - Hudson–Bergen Light Rail Transit System |
| ISTEA | - Intermodal Surface Transportation Efficiency Act |
| LRT | - Light Rail Transit |
| LRV | - Light Rail Vehicle |
| MIS | - Major Investment Study |
| NCS | - Newark City Subway |
| NEPA | - National Environmental Policy Act |
| NERL | - Newark–Elizabeth Rail Link |
| NJT | - New Jersey Transit |
| NJTPA | - North Jersey Transportation Planning Authority |
| PCCs | - President's Conference Committee Cars |
| VBF | - Vehicle Base Facility |

### *ORDER*

In accordance with the Court's Opinion filed herewith,

It is on this 9th day of December, 1998

ORDERED that defendants' motions for summary judgment are granted; and it is further

ORDERED that plaintiff's motions for preliminary and permanent injunctive relief, and for summary judgment, are denied; and it is further

ORDERED that defendants' motion to dismiss is granted.